IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR. NO. 12-01256-DKW |
| ) | |
| Plaintiff, ) | MEMORANDUM IN |
| ) | SUPPORT OF MOTION |
| vs. ) | |
| ) | |
| JACOB LYMAN, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF MOTION

On July 30, 2014, this Court sentenced Defendant JACOB LYMAN to 240-months imprisonment for methamphetamine distribution. ECF No. 55. Mr. Lyman is incarcerated at FCI Lompoc with a projected release date of December 24, 2029.[1] For the reasons stated herein, the growing COVID-19 pandemic, which public health experts recognize is especially dangerous in correctional institutions, and certainly at FCI Lompoc, in tandem with Mr. Lyman's risk factors, including his chronic kidney disease, asthma, age and obesity, together present as extraordinary and compelling circumstances under 18 U.S.C. § 3582(c)(1)(A)(i). The § 3553(a) factors also support his request.

---

[1]     BOP, *Find an Inmate*, https://bit.ly/2VzCDkH (July 1, 2020).

1.      18 U.S.C. § 3582(c)(1)(A)(i) permits courts to consider compassionate release motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" On April 15, 2020, Mr. Lyman requested compassionate release from the BOP. *See* Exhibit A. On May 4, 2020, the warden declined to file a motion for compassionate release on Mr. Lyman's behalf.[2] *See* Exhibit B. Mr. Lyman continues to pursue his administrative remedies. *See* Exhibit C. Here, the 30-day requirement under 18 U.S.C. § 3582(c)(1)(A)(i) has been satisfied and his Motion is thus ripe for the Court's consideration.

---

[2]     To the extent that any response from the government suggests that this Court should defer to the BOP's judgment in declining Mr. Lyman's requests, it should be noted that defense counsel is unaware of any compassionate release motions brought by the BOP in any case, in this district or elsewhere. Indeed, in a recent filing in the Supreme Court regarding FCI Elkton, the DOJ noted that the BOP has "considered numerous requests from Elkton inmates for 'compassionate release,' …. Congress has not, however, adjusted the compassionate release procedures in light of COVID-19[.]" *See Williams v. Wilson,* No. 19A-_____, *Application for a Stay of the Injunction Issued by the United States District Court for the Northern District of Ohio,* (U.S. May 20, 2020), at 14. This indicates that the BOP will not consider compassionate release in COVID-19 cases absent further direction from Congress. *See also Torres, et al. v. Milusnic, et al.*, DC No. 2:20-cv-04450, ECF 1 (complaint), at 6-8 (C.D. Cal.) (05/16/20) (class action complaint describing similar non-action).

2.      Once a defendant satisfies the 30-day lapse requirement, the Court may reduce a defendant's sentence if extraordinary and compelling reasons warrant such a reduction, such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission,[3] and the Court determines that "[t]he defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2), 18 U.S.C. § 3582(c)(1)(A)(i). The Court may act independently of the BOP,[4] but must consider "the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable." *Id.* § 3582(c)(1)(A).

---

[3]     The compassionate release statute, as amended, does not specifically define what constitutes "extraordinary" or "compelling circumstance" other than to state that a reduction must be "consistent" with the Commission's policy statements. Congress delegated responsibility to the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(t)). The Sentencing Commission has determined that a defendant's circumstances meet this standard when, *inter alia,* the defendant is "suffering from a terminal illness" or a "serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," or if, in the judgment of the BOP, the defendant's circumstances are extraordinary and compelling for "other reasons." U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A), (D).

[4]     Following the passage of the First Step Act, courts may independently determine whether such "other reasons" are present in a given case, without deference to the BOP's judgment. *See United States v. Lisi,* CR No. 15-457, 2020 WL 881994, at *3 (S.D.N.Y.) (Feb. 24, 2020); *United States v. Kamaka*, CR No. 18-00085-SOM, ECF 57 at 5–7 (D. Haw) (May 29, 2020) (order granting § 3582 motion); *United States v. Maka*, CR No. 03-00084-SOM, ECF 286 at 5–8 (D. Haw) (May 19, 2020) (order denying §3582 motion). *See also, United States v. Kakanami,* CR 14-00621 LEK (D. Haw.) (June 2, 2020). Mr. Lyman acknowledges this Court's prior decisions and argues that his medical conditions—

  3. The United States has become the epicenter of the global COVID-19 pandemic, with at least 2,676,680 reported cases and 127,762 deaths.[5] Nationwide, cases continue to increase at record rates, with more than 48,000 daily new cases reported on June 30, 2020.[6] COVID-19 within the BOP has similarly spread like wildfire. On April 30, 2020, several weeks after Mr. Lyman requested compassionate release from the BOP, there were 2,599 confirmed cases of COVID-19 within the BOP (2118 inmates and 481 staff).[7] Thirty-three federal inmates had died from the virus.[8] As of July 1, 2020, there are now 7,441 confirmed cases (6,698 inmates and 743 staff)—an increase of 186.30%—and at least 90 inmate deaths,[9] an increase of an increase of 172.72%. To the extent that

---

chronic kidney disease and asthma in particular—qualify as an extraordinary and compelling reason under U.S.S.G. § 1B1.13(1)(A) cmt. (1)(A)(ii).

[5] *Coronavirus Map: Tracking the Spread of the Outbreak,* N.Y. Times, https://nyti.ms/2U4kmud (last visited July 1, 2020).

[6] *U.S. Cases Reach New Record*, N.Y. Times (June 30, 2020), https://nyti.ms/2BjyLxf (last visited July 1, 2020).

[7] BOP, *Coronavirus*, https://bit.ly/3eFCtje. The BOP segregates the numbers of confirmed cases on its website into current "confirmed positive test results" and "recovered." The numbers herein include both current and "recovered." (last visited July 1, 2020).

[8] *Id.*

[9] *Id.*

the government's response discusses the BOP's "substantial measures" in preparation or in reaction to COVID-19, the numbers above speak for themselves.

The numbers have been especially egregious at FCI Lompoc, where, in mid-May of this year, the facility suffered the worst COVID-19 outbreak of any federal penitentiary, where 70% of inmates tested positive.[10] As of July 1, 2020, 867 inmates have, or had, COVID-19 (out of a total population of 989, an infection rate of nearly 90%), and two inmates have died from it.[11] And though the numbers have decreased since the May outbreak, FCI Lompoc draws its staff from Santa Barbara County—which currently has 2,896 cases with 29 deaths"[12]—which means staff members who enter and exit the facility and interact with outside community members will continue to subject vulnerable inmates to the risk of additional exposure, whether they know it or not. Community spread has spiraled so out of control in parts of California that Governor Gavin Newsom, as of July 1, 2020, ordered 19 counties—including Santa Barbara—to halt indoor operations in

---

[10] Richard Winton, 70% of inmates test positive for coronavirus at Lompoc federal prison, L.A. Times (May 9, 2020), https://lat.ms/38lC7vr (last visited July 1, 2020).

[11] *Supra*, fn. 7.

[12] Santa Barbara County Public Health Department, *Current Status of COVID-19 in Santa Barbara County*, https://publichealthsbc.org/status-reports/ (last visited July 1, 2020).

restaurants, wineries, movie theaters, museums, zoos, and cardrooms for at least three weeks, and that bars and breweries must fully close indoor and outdoor operations.[13]

Given this background, it is no surprise that Mr. Lyman contracted COVID-19. *See* Exhibit D, at pp. 1, 9, 16, and 20. Though Mr. Lyman's medical records do not appear to suggest serious symptoms as of May 20, 2020 (he advises that he continues to cough and has PTSD, *see* Declaration of Counsel), he is still at risk of developing them. Both the World Health Organization (WHO) and the CDC caution that it is not yet known whether people who have recovered from COVID-19 can become infected again. According to the WHO, "there is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection."[14] And according to the CDC, "the immune response to COVID-19 is not yet understood … [and] it is not yet known whether similar immune protection will be observed for patients with COVID-19."[15]

---

[13]    Dustin Gardiner, *Newsom orders new shutdown of restaurants, other indoor businesses in 19 California counties*, San Francisco Chronicle (July 1, 2020), https://bit.ly/38ntn8q (last visited July 1, 2020).

[14]    World Health Organization, *"Immunity Passports" in the Context of COVID-19*, (April 24, 2020) https://bit.ly/2Vj5Xvu (last visited July 1, 2020).

[15]    CDC, *Clinical Questions About COVID-19: Questions and Answers* (June 25, 2020), https://bit.ly/3dwceKn (last visited June 25, 2020).

This is true for those who had only a mild version of the illness. In early testing, not all individuals infected with COVID-19 developed antibodies. In particular, mild cases of COVID-19 can resolve before significant and enduring levels of antibodies are found.[16] Indeed, there are a number of reported cases of individuals who have "recovered," tested negative, and later tested positive again.[17] In other words, there simply is not enough experience with COVID-19 to say that Mr. Lyman is safe from the potentially devastating effects of COVID-19: he may not be able to recover fully down the road, even if he purportedly has, now.

Aside from this risk during his continued incarceration, Mr. Lyman's medical records from the BOP demonstrate that he suffers from the following health conditions: (1) asthma; (2) gout; (3) body mass index (BMI) 40-44.9 (severe obesity); (4) chronic kidney disease; (5) hyperglycemia; (6) hyperlipidemia; and (7) mild degenerative disc disorder (specifically, unspecified thoracic, thoracolumbar and lumbosacral intervertebral disc disorder).[18] *See* Exhibit D, at pp.

---

[16]   Robert D. Kirkcaldy et al., *COVID-19 and Post infection Immunity*, JAMA (May 11, 2020), https://bit.ly/3dOCAHW (last visited July 1, 2020).

[17]   *See, e.g.,* Sarah McCammon, *13 USS Roosevelt Sailors Test Positive for COVID-19, Again*, NPR (May 16, 2020) (reporting that 13 sailors who had apparently recovered from COVID-19 and received negative test results had tested positive for a second time) https://tinyurl.com/y7g7ee8u (last visited July 1, 2020).

[18]   Note that number (7) is defense counsel's educated guess based on the contractions used in the record. To manage his health problems, Mr. Lyman takes the following prescription medications: (1) Naproxen (for degenerative disc

3, 14. He is also considered pre-diabetic. *Id.* Mr. Lyman has been treated for joint derangement, low back pain and pain, unspecified. *Id.* at pp. 3, 8, 31.

As noted, a defendant may provide an extraordinary and compelling reason for a sentence reduction when, *inter alia,* the defendant is suffering from a serious physical or medical condition that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A)(ii). In Mr. Lyman's case, his chronic kidney disease is one such serious medical condition of which he is not expected to recover from,[19] is recognized by the CDC as "increase[ing] your risk for severe illness from COVID-19,"[20] and the BOP's modified operations have hampered his ability to provide adequate self-care, as reflected by widespread reporting,[21] and laid out in the ACLU's lawsuit

---

disorder); (2) Rosuvastatin (for hyperlipidemia); (3) Albuterol Inhaler (every four hours as needed to prevent/relieve asthma attack); and (4) Mometasone Furoate Inhaler (every day for asthma symptoms). *Id.* at pp. 3, 18-19. Mr. Lyman's list of active prescriptions also includes Allopurinol (for gout), which has expired but has not been discontinued. *See id.* at p. 18.

[19] "Some types of kidney disease can be treated. Often, though, chronic kidney disease has no cure." *See* Mayo Clinic, *Chronic Kidney Disease*, https://mayocl.in/3eVYSZs (last visited July 1, 2020).

[20] CDC, *Chronic Kidney Disease* (June 25, 2020), https://bit.ly/38jIMGu (last visited July 1, 2020).

[21] "Staff ignored or minimized prisoners' COVID-19 symptoms, and mixed the sick and healthy together in haphazard quarantines; thousands of prisoners were

against FCI Lompoc.[22] In other words, the conditions within the BOP, including FCI Lompoc, are nothing less than punitive, counter-productive and cruel,[23] rendering "self-care" not feasible:

> "[T]he prison environment prevents [defendant] from being able to effectively self-isolate in the ways the CDC recommends for a person of his age and diminished health. In this moment, the inability for high risk individuals to fully self-isolate is an inability to provide self-care. So long as [defendant] remains in custody, his capacity to protect himself from a serious, or even fatal, infection will be compromised."[24]

---

shipped around the country in February and early March, taking the virus with them, according to BOP records obtained by VICE News and The Marshall Project; correctional officers and other staff felt pressured to work even after being exposed to sick prisoners; the BOP failed to follow its own pandemic response plan, which called for spacing out prisoners [as] photos and videos show sick men in bunk beds just two feet apart; federal officials have allegedly tried to conceal the extent of the outbreak by limiting testing—so that they didn't have to report positive cases—and refusing to recognize one staff death, and as of [June 16, 2020] they had completed testing on less than 13 percent of prisoners in BOP-run facilities; prisoners reported being quarantined in filthy buildings that had been vacant for years or in tents that flooded during rainstorms[, and] some described listening to their friends dying around them." *See* Keri Blakinger and Keegan Hamilton, *"I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps,* The Marshall Project (June 18, 2020) https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps (last visited July 1, 2020).

[22] *See Torres, et al. v. Milusnic, et al.*, DC No. 2:20-cv-04450, ECF 1 (complaint), at 6-8 (C.D. Cal.) (05/16/20) (class action complaint describing conditions at FCI and USP Lompoc).

[23] *See,* BOP Modified Operations Plan generally, www.bop.gov (last visited July 1, 2020).

[24] *United States v. Esparza*, No. 1:07-CR-00294-BLW, 2020 WL1696084, *3.

Mr. Lyman submits that the conditions at FCI Lompoc, as described in *Torres,* substantially diminish his ability to provide self-care for his various health issues, including chronic kidney disease. In addition, Mr. Lyman's asthma, for which he uses an albuterol inhaler[25] and Mometasone Furoate,[26] may well be "moderate to severe," thereby increasing his risk to severe illness to COVID-19,[27] and is a condition he is unlikely to recover from.

Mr. Lyman further submits that his other risk factors, per the CDC, together present as extraordinary and compelling circumstances under 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Lyman's age is one such additional risk factor. The CDC

---

[25] "An albuterol inhaler is a device designed to deliver albuterol, a medicine used to prevent and treat wheezing and shortness of breath caused by breathing problems (such as asthma, chronic obstructive pulmonary disease) … It is a quick-relief medication." *See* WebMD, *Albuterol Sulfate 90 Mcq/Actuation Breath Activated Powder Inhaler,* at https://wb.md/30WXeTu. Furthermore, "according to the National Heart, Lung, and Blood Institute, albuterol is not recommended for repeat use. If you use your albuterol inhaler two or more days a week to relieve asthma symptoms, or if you have to use it repeatedly to control symptoms, your asthma is not well-controlled." *See* Madeline R. Vann, MPH, *Albuterol for Asthma Control,* Feb. 5, 2009, Everyday Health, at https://bit.ly/30XELWS (last visited July 1, 2020).

[26] Mometasone Furoate (also known as Asmanex) is an inhaled corticosteroid, which are "considered the most effective long-term usage medication for control and management of asthma. *See AAAAI Guide,* at https://bit.ly/2UY0sC8 (last visited July 1, 2020).

[27] CDC, *People of Any Age with Underlying Medical Conditions*, https://bit.ly/2B6CoGK (last visited July 1, 2020).

previously categorized those as "65 and older" at increased risk from COVID-19. As of June 25, 2020, however, the CDC updated its guidelines and now states "among adults, the risk for severe illness from COVID-19 increases with age, with older adults at highest risk … in general, your risk of getting severely ill from COVID-19 increases as you get older. In fact, 8 out of 10 COVID-19 related deaths reported in the United States have been among adults aged 65 years and older." [28] Mr. Lyman is 40, with comorbidities. While he may not be very old, he is certainly not a healthy young man.

Obesity is another risk factor. The CDC considers "obesity, defined as a body mass index (BMI) of 30 or above" as "increase[ing] your risk of severe illness from COVID-19,"[29] whereas previously, it only considered severe obesity (BMI greater than or equal to 40) as a risk factor. Data from COVID-19 patients across the United States could be the reason for this change. For example, in a study of 3,000 patients in New Orleans who tested positive for the coronavirus, 59% of the hospitalized patients were obese with an average BMI of 33.[30] The

---

[28]   CDC, *Older Adults,* https://bit.ly/3i5LILG (July 1, 2020).

[29]   CDC, *People of Any Age with Underlying Medical Conditions*, https://bit.ly/2B6CoGK (last visited July 1, 2020).

[30]   Jennifer Clopton, *Obesity New Risk Factor for Young COVID Patients*, WebMD, https://wb.md/3g6pPtP (last visited July 1, 2020).

study also found that obesity, aside from age, was the other leading risk factor for ending up in the hospital and ICU, producing an even higher rate than the risk created by heart disease, diabetes, and even chronic lung disease.[31] Stated otherwise, "BMI is the Achilles' heel for American patients … in China it was smoking and pollution, and Italy had a larger older population, and many grandparents lived with extended families. Here, it's BMI that's the issue."[32] Mr. Lyman is at greater risk with a BMI of 40-44.9 *See* Exhibit D, at p. 3.

In sum, this unprecedented global pandemic and its impact at FCI Lompoc, together with Mr. Lyman's chronic kidney disease, asthma, age and obesity, present as extraordinary and compelling reasons to reduce his sentence.

4. When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a). First, the COVID-19 pandemic and the outbreak at FCI Lompoc, in addition to his contraction of COVID-19, is a new and significant § 3553(a) factor. So are Mr. Lyman's various

---

[31] *Id.*

[32] Dawn Fallik, *COVID-19 is Hitting Some Patients with Obesity Particularly Hard,* Science News (April 22, 2020), https://bit.ly/2YzwFBW (last visited July 1, 2020).

medical issues, which were not detailed in his PSR, and therefore were unlikely accounted for by the Court when it imposed its sentence (the Court was nevertheless constrained by the mandatory minimum). Furthermore, under *Pepper*, the Court must consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." *Pepper* at 492. Mr. Lyman submits his BOP records regarding his programming and behavior. *See* Exhibit E.

Second, § 3553(a)(2)(A) requires the Court "…to provide just punishment for the offense." Just punishment does not contemplate exposure to a life-threatening illness. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to "contagious diseases caused by overcrowding conditions"). The United States Attorney's Office for the District of Hawaii agrees. In a recent press release on an unrelated criminal matter, the U.S. Attorney opined "[t]hose committed to the custody of our state and federal detention facilities do not jettison their constitutional rights when they pass through the doors to those facilities. They are entitled to humane treatment, which includes constitutional safeguards, such as the

right to be free of 'cruel and unusual punishment' while in custody." *See* Exhibit F. Moreover, the BOP's modified operations has meant that Mr. Lyman, for the past several months, has been placed on partial or total lockdown, where he has been deprived of access to family and the outside world due to limited use of the telephone or computer, all the while living in constant fear of a deadly infection, which he, in fact, contracted. This has resulted in harsher punishment than any "normal" term of imprisonment, and far exceeds what might reasonably be considered "just" punishment.

Additionally, § 3553(a)(2)(D) requires the Court to consider "the need to . . . provide the defendant with needed . . . medical care . . . in the most effective manner." If released, Mr. Lyman would be able to practice social distancing and engage in better hygiene practices, and could live with his father in Hawaii where community transmission remains low. *See* Declaration of Counsel. He would be able to seek his own medical care rather than rely on a medical system that, even in the best of times, is subpar. If he remains incarcerated, however, he will be unable to practice social distancing, and he will continue to receive "care" through the BOP system that will, at least for the foreseeable future, be focused on fighting a different battle.

On the other side of § 3553(a) are significant concerns. Mr. Lyman received a 240-month sentence for methamphetamine distribution. His crime was serious.

He is a repeat offender. But neither his crime nor his criminal history should preclude relief. Courts have granted compassionate release to defendants convicted of worse offense conduct and had lengthier criminal histories—including career offenders—than Mr. Lyman. *See* Exhibit G. Nor should Mr. Lyman's time served (in custody since November 29, 2012) preclude him from relief. Courts have granted compassionate release to defendants serving lengthy terms of incarceration like Mr. Lyman, yet had considerable time remaining.[33] *See* Exhibit H.

     5.    Mr. Lyman respectfully requests that the Court reduce his sentence to time served and amend the conditions of supervision as required.

     DATED:  Honolulu, Hawaii, July 2, 2020.

                                            Respectfully submitted,

                                            /s/ Max J. Mizono
                                            MAX J. MIZONO
                                            Attorney for Defendant
                                            JACOB LYMAN

---

[33] Though Mr. Lyman's mandatory sentence in this case was 240 months, the First Step Act decreased the requisite mandatory minimum on a 10-year mandatory minimum drug offense to 15-years (rather than 20). Mr. Lyman nevertheless concedes he has not yet served even 15 years in this case, but is close to serving nearly his original mandatory minimum of ten years prior to the filing of the special information pursuant to 21 U.S.C. § 851, and asks the change in law be considered under § 3553(a). *See United States v. Cantu-Rivera,* 2019 WL 2578272, *2 (S.D. Tex. Jun. 24, 2019) (recognizing the FSA's elimination of life imprisonment as a mandatory sentence solely by reason of a defendant's prior convictions as a factor in determining the appropriateness of resentencing under 18 U.S.C. § 3582(c)(1)(A).